[Cite as *Hutchinson v. Hutchinson*, 2014-Ohio-4604.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

KYLE HUTCHINSON

       Plaintiff-Appellee

v.

VIRGINIA HUTCHINSON

       Defendant-Appellant

Appellate Case No.    26221

Trial Court Case No.   2012-DR-510

(Appeal from Domestic Relations Court)

. . . . . . . . . . .

**O P I N I O N**

Rendered on the 17th day of October, 2014.

. . . . . . . . . . .

DAVID M. MCNAMEE, Atty. Reg. No. 0068582, 2625 Commons Boulevard, Suite A, Beavercreek, Ohio 45431
      Attorney for Plaintiff-Appellee

ELIZABETH J. HENLEY, Atty. Reg. No. 0034207, 131 North Ludlow Street, Suite 1205, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Virginia Hutchinson, appeals from a divorce judgment designating Plaintiff-Appellee, Kyle Hutchinson, residential parent and legal custodian of the parties' minor child, K.H.[1] In support of her appeal, Virginia contends that the trial court denied her due process by not affording her an opportunity to cross-examine the guardian ad litem. Virginia further contends that the trial court abused its discretion by failing to consider the relevant statutory factors in R.C. 3109.04(F)(1).

{¶ 2} In addition, Virginia contends that the trial court abused its discretion by failing to interview the minor child, and by failing to consider that Virginia was the child's primary caretaker. Finally, Virginia contends that the trial court erred in relying on an out-of-date investigator's report that was biased.

{¶ 3} We conclude that Virginia was not denied due process, as she chose not to subpoena the family investigator for the trial. The trial court also did not abuse its discretion in failing to interview the minor child, as the child was quite young at the time of the divorce hearing. In addition, the trial court properly considered the factors in R.C. 3109.04(F)(1) regarding the best interests of the parties' minor child.

{¶ 4} We further conclude that the trial court was not required to give presumptive weight to any party's status as a primary caregiver. Kyle had served as a primary caregiver for K.H. in the past, and the trial court granted him equal parenting time with the child eight months before the final divorce hearing. However, Virginia interfered with his parenting time. Finally, the trial court did not improperly rely on an investigator's report, but instead heard evidence at the hearing, which indicated that Virginia's life was even more unstable than when the

_____

[1] For purposes of convenience, we will refer to the parties by their first names.

investigator prepared her report.   Accordingly, the judgment of the trial court will be affirmed.

## I.   Facts and Course of Proceedings

{¶ 5}     The subject of this custody dispute, K.H., was born in February 2009.   Between then and February 2012, the parties lived in the Dayton area, together with Virginia's older child, A.G.   In 2011, Kyle quit his employment with Fortis College in order to stay home with the children while Virginia completed her nursing degree.   After finishing her degree, Virginia moved with the children to Manassas Fork, Virginia, in mid-February 2012.   After she arrived, Virginia was residing with a family friend, or cousin.   Ostensibly, the plan was for the family to relocate, but when Kyle arrived a few weeks later, he stayed only a week before Virginia kicked him out.   Since Kyle had nowhere else to go, he returned to Ohio and filed for divorce in May 2012.[2]

{¶ 6}     In August 2012, temporary custody was given to Virginia, and Kyle was granted standard visitation.   Kyle attempted to enforce the visitation order by offering to drive to Virginia and stay in a hotel.   His offer was accepted once, in early October 2012, and he was able to see K.H.   At a court hearing in September 2012, Virginia agreed to two- week-long visitations for K.H. and Kyle in late October 2012, mid-November 2012, late December 2012, early January 2013, and early February 2013.   However, when Kyle flew to Reagan International Airport on October 27, 2013, after having purchased tickets for himself and K.H., Virginia did not show up at the airport.   She also did not answer his phone calls until he had flown home

---

[2]   As with a number of facts, there was some dispute.   Virginia claimed the person she lived with was a cousin; Kyle claimed the person was a family friend.   Kyle also claimed that Virginia misled him into letting her move to Virginia, when she actually intended to end the marriage.   Virginia testified at trial that the couple was going to move to Virginia to work on their marriage.

after waiting at the airport for five hours. According to Kyle, Virginia's explanation was that she had child-care issues and she said something about her car. However, the report of the family investigator indicates that Virginia felt that Kyle should pick up K.H. at a park near her house, rather than her driving the child to the airport.

{¶ 7} The November 2012 visitation also did not occur, because Virginia again refused to drive the child to the Reagan Airport. In addition, the December 2012 visitation did not occur as scheduled. In January 2013, Kyle filed a motion for contempt with respect to the October visitation. Ultimately a magistrate heard the matter and issued a decision in May 2013. The magistrate did not find Virginia in contempt because the method of transportation had not been addressed in the initial order, and because she provided additional visitation in January 2013. The magistrate then ordered that the parties would have alternating two-week visitation periods beginning on May 13, 2013, and that each party would be responsible for the costs involved in returning the child to the other parent. Additionally, the magistrate ordered that the parties could either drive the child back to the other parent or fly the child back by way of Dulles Airport.

{¶ 8} In the meantime, the court had referred the case to the Family Relations Department (FRD) for an investigation. Between December 2012 and January 2013, the investigator met with both parents, and observed the child with each parent. After investigating, the report recommended that Kyle should be designated the residential parent and sole custodian of K.H., and that Virginia should have one-week of parenting time per month prior to the time the child started Kindergarten. After that time, Virginia should have one weekend of parenting time per month in the Dayton area, except for holiday weekends. Finally, summer parenting should be pursuant to the court's standard order.

{¶ 9}    The recommendation was based on Virginia's actions over the past year, which demonstrated a lack of stability, including:  living in three different residences; holding at least three different jobs; taking a leave of absence from her job in January 2013 and moving the children temporarily to Dayton, Ohio, where she stayed with a friend, and moving back to Virginia after a month; and interfering with Kyle's visitation.  The investigator also noted certain credibility concerns, including Virginia's cancellation of a scheduled appointment one hour before the appointment, by claiming that there were blizzard warnings in the area where she lived, when there was actually only a light dusting of snow.  This also interfered with Kyle's scheduled visitation in December 2013.[3]  In addition, Virginia denied being involved in a relationship in Virginia, even though she admitted that her male childcare provider, C.C., had words with Kyle in a park during a parenting time exchange.[4]

{¶ 10}    In June 2013, Kyle filed a second motion for contempt, contending that he was denied his parenting time when Virginia refused to return the child on June 10, 2013.  Service of the motion was sent to Virginia at the address she had disclosed to the court, but was unclaimed.  In July 2013, new counsel entered an appearance for Virginia.  Service by regular mail was attempted at Virginia's address in July 2013, but failed.

{¶ 11}    Subsequently, in September 2013, Kyle filed a motion to modify parenting time to the FRD recommendation, based on Virginia's continued denial of visitation.  When this motion was sent to the address Virginia had listed, it was returned with a notification that

[3]    The area in question was Virginia's residence in the D.C. area, which means that Virginia had no intention of attending the appointment in Dayton, Ohio, regardless of weather, since she called only one hour before the appointment to cancel.

[4]    At trial, Kyle testified that C.C. was Virginia's boyfriend and was the father of Virginia's child, who was born in December 2013.    The child also has the same first name as C.C.

Virginia had not lived there since July 2013. However, Virginia did not provide a current address either to the court or to Kyle until the time of the final divorce hearing, which occurred in late January 2014.

{¶ 12} At a hearing held in November 2013 on the modification motion, the magistrate noted that Kyle did not have his parenting time as arranged in July 2013, and last saw the child after he returned the child during his most recent parenting time, in July/ August 2013. The magistrate further noted that Kyle had attempted contact via phone calls and text messages, which had not been returned. The magistrate then ruled that parenting time should occur on alternating months, with Kyle having K.H. for the month of December 2013. In addition, the magistrate ordered that Kyle would be responsible for picking up the child at Virginia's residence, and that she would be responsible for picking up K.H. to return to her residence.

{¶ 13} Virginia was not present at the November 2013 hearing, but she was represented by counsel. In mid-December 2013, Virginia's counsel asked for permission to withdraw as counsel, due to multiple issues communicating with Virginia, and the request was granted. Virginia then appeared pro se for the final divorce hearing, which had been previously scheduled for January 28, 2014. Virginia did not request time then to obtain new counsel, nor had she previously requested additional time.

{¶ 14} At trial, both parties testified, and the trial court issued a decision designating Kyle as the residential parent and legal custodian. The court granted Virginia ten days of consecutive parenting time per month until K.H. started school. After that time, Virginia would have the standard order of visitation, with the exception that parenting time would be in the Dayton area, and all holiday and summer visitation would occur in Virginia. The court also ordered Virginia to pay child support.

{¶ 15}    Virginia appeals from the final judgment and decree, which was filed on May 2, 2014.

## II.  Was Virginia Denied Due Process?

{¶ 16}    Virginia's First Assignment of Error states that:

The Trial Court Committed Reversible Error and Denied the Appellant's Right to Due Process of Law by Not Affording Her an Opportunity to Cross-Examine the Guardian Ad Litem.

{¶ 17}    Under this assignment of error, Virginia contends that the trial court violated R.C. 3109.04(C) and her right to due process of law by failing to make the court-appointed investigator available in court for cross-examination.

{¶ 18}    Before addressing this point, we should note that " '[l]itigants who choose to proceed pro se are presumed to know the law and correct procedure, and are held to the same standards as other litigants.' "   *Preston v. Shutway*, 2013-Ohio-185, 986 N.E.2d 584, ¶ 12  (2d Dist.), quoting *Yocum v. Means*, 2d Dist. Darke No. 1576, 2002-Ohio-3803, ¶ 20. (Other citations omitted.)   Because Virginia chose to proceed pro se, she is not afforded special treatment, but is treated like any other litigant.  *Id.*

{¶ 19}    As a preliminary matter, we note that Virginia failed to raise any issues pertaining to the FRD investigator at trial.   Therefore, we review this issue under the plain error doctrine, which " 'provides for the correction of errors clearly apparent on their face and prejudicial to the complaining party even though the complaining party failed to object to the error at trial.' "   *Corey v. Corey*, 2d Dist. Greene No. 2013-CA-73, 2014-Ohio-3258, ¶ 8, quoting *O'Brien v. O'Brien*, 5th Dist. Delaware No. 2003-CA-F12069, 2004-Ohio-5881, ¶ 19. (Other citation omitted.)   Furthermore, " '[t]he plain error doctrine may be utilized in civil

cases only with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *Id.,* citing *O'Brien* at ¶ 19.   (Other citation omitted.)

{¶ 20}    With respect to investigations, R.C. 3109.04(C) provides that:

Prior to trial, the court may cause an investigation to be made as to the character, family relations, past conduct, earning ability, and financial worth of each parent and may order the parents and their minor children to submit to medical, psychological, and psychiatric examinations.    The report of the investigation and examinations shall be made available to either parent or the parent's counsel of record not less than five days before trial, upon written request.  The report shall be signed by the investigator, and the investigator shall be subject to cross-examination by either parent concerning the contents of the report. The court may tax as costs all or any part of the expenses for each investigation.

{¶ 21}    We have previously held that "the language of both R.C. 3109.04(A) [now (C)] and Civ.R. 75(D) implicitly confers upon the trial court the authority to admit custody-investigation reports into evidence." *Roach v. Roach*, 79 Ohio App.3d 194, 200, 607 N.E.2d 35 (2d Dist.1992).  In addition, "even if inadmissible hearsay is included in the report, when a trial judge acts as the finder of fact, he or she is presumed capable of disregarding improper testimony."   (Citations omitted.)   *In re A.L.*, 6th Dist. Lucas No. L-10-1355, 2011-Ohio-2569, ¶ 35.

{¶ 22}    The Domestic Relations Division of the Montgomery County Court of Common Pleas has also provided as follows in its local rules of court:

The written report of the guardian ad litem or Family Investigator shall be

submitted to the assigned judge or magistrate, with copies to both attorneys, no less than seven (7) days before the scheduled hearing unless otherwise ordered. The report shall not be submitted to the Clerk of Courts for filing.

The report shall be accepted into evidence as the guardian ad litem's direct testimony. He or she may be subject to cross-examination by either party. A party desiring to cross-examine the guardian ad litem shall arrange for their appearance by filing a subpoena and is responsible for any additional fee for that appearance.

Loc.R. 4.29 of the Court of Common Pleas of Montgomery County, Domestic Relations Division.

{¶ 23} The requirements in the local rule exceed those in R.C. 3109.04(C), and were satisfied in the case before us. Attachments to the report indicate that it was sent to the parties' attorneys on February 5, 2013. See Court Exhibit I (containing letters to attorneys for both parties, attaching the Family Investigation Report). Consistent with Loc.R. 4.29, the report was not filed with the Clerk of Courts. The report was provided to the parties nearly one year in advance of the trial, which was held on January 28, 2014. Virginia and her counsel, therefore, had ample notice of the content of the report. They also had ample notice of the trial date, which was previously set on September 6, 2013. As a result, Virginia could have subpoenaed the investigator to testify, but failed to do so.

{¶ 24} In support of her contention that she should have been entitled to cross-examine the investigator, Virginia relies on the case of *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, in which the Supreme Court of Ohio held that "[i]n a permanent custody proceeding in which the guardian ad litem's report will be a factor in the trial court's decision,

parties to the proceeding have the right to cross-examine the guardian ad litem concerning the contents of the report and the basis for a custody recommendation."   *Id*. at syllabus.

**{¶ 25}**   *Hoffman* could be distinguished on the basis that it involved termination of parental rights, which the court described as the " 'the family law equivalent of the death penalty in a criminal case.' "   *Id*. at ¶ 14, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997).   Unlike *Hoffman*, the case before us does not involve termination of parental rights – it involves a decision as to which parent will have legal custody of a child – a situation that is always subject to future change based on a change in circumstances.   *See* R.C. 3109.04(E).   Furthermore, unlike the parties in *Hoffman*, Virginia was not denied the right to cross-examine the investigator.   *Hoffman* at 93.   Other courts have found *Hoffman* inapplicable on these grounds.   *See, e.g., Jackson v. Herron,* 11th Dist. Lake No.2003-L-145, 2005-Ohio-4046, ¶ 20.

**{¶ 26}**   Even if this were otherwise, the point being made in *Hoffman* is that due process encompasses " ' "fundamental fairness," a requirement whose meaning can be as opaque as its importance is lofty.' "   *Hoffman* at ¶ 17, quoting *Lassiter v. Dept. of Social Serv. of Durham Cty., North Carolina*, 452 U.S. 18, 24-25, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).   "Our courts have long recognized that due process requires both notice and an opportunity to be heard." (Citations omitted.)   *In re Thompkins*, 115 Ohio St.3d 409,   2007-Ohio-5238, 875 N.E.2d 582, ¶ 13.

**{¶ 27}**   Consistent with these requirements, the procedure outlined in Loc. R. 4.29 provides for notice and an opportunity to be heard.   Parties must receive a copy of the report at least seven days before trial, and they are permitted to subpoena the pertinent witness for cross-examination.    As a result, the trial court offered Virginia all process that was due.   The fact that Virginia chose not to subpoena the witness does not mean that she was deprived of due

process of law. *Compare Wilburn v. Wilburn*, 169 Ohio App.3d 415, 2006-Ohio-5820, 863 N.E.2d 204, ¶ 33 (9th Dist.) (holding that a mother had abandoned her right to a guardian ad litem's report, based on her failure to provide a written request for the report or to request a recess at trial to review the report).

{¶ 28} Accordingly, Virginia's First Assignment of Error is overruled.

### III. Did the Trial Court Fail to Consider the Relevant Statutory Factors?

{¶ 29} Under this assignment of error, Virginia contends that the trial court abused its discretion by failing to consider the relevant statutory factors in R.C. 3109.04(F)(1). In particular, Virginia points to the fact that the court failed to consider K.H.'s adjustment to her community in Virginia or the relationship between K.H. and her siblings.

{¶ 30} Although trial courts must be guided by the language in R.C. 3109.04, they also enjoy broad discretion in allocating parental rights and responsibilities. *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). Moreover, the Supreme Court of Ohio has stressed that "[t]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record." (Citation omitted.) *Id.*

{¶ 31} We review a trial court's custody decisions for abuse of discretion, which means that the trial court must not have acted unreasonably, arbitrarily, or unconscionably. *Edwards v. Edwards*, 2d Dist. Montgomery No. 25309, 2013-Ohio-117, ¶ 32-33. We noted in *Edwards* that:

R.C. 3109.04(F)(1)(a)-(j) provide a set of factors that the court uses to decide the best interests of the child. These factors include: (a) the parents' wishes; (b) the child's wishes, if the court has interviewed the child; (c) the child's interaction with parents, siblings, and others who may significantly affect the child's best interests; (d) adjustment of the child to home, school, and community; (e) the mental and physical health of all involved persons; (f) which parent is more likely to honor parenting time rights; (g) any failure to make child support payments, including arrearages; (h) any prior convictions involving abuse, neglect, or sexually oriented offenses involving family members: (i) conscious and willful denial of the other parent's right to court-ordered parenting time; and (j) whether either parent has established a residence or plans to establish a residence outside the state.

*Id.* at ¶ 26.

{¶ 32} We have previously held that "[a]lthough the court is instructed by R.C. 3109.04(F)(1) to 'consider' the factors enumerated therein, the court's alleged failure to give the required consideration will not be found by an appellate court to be against the manifest weight of the evidence so long as the court's judgment is supported by some competent, credible evidence." *Feldmiller v. Feldmiller*, 2d Dist. Montgomery No. 24989, 2012-Ohio-4621, ¶ 32, citing *Bunten v. Bunten*, 126 Ohio App.3d 443, 710 N.E.2d 757 (3d Dist.1998). In *Bunten*, the court stressed that "it is not necessary for the court to set forth its analysis as to each factor in its judgment entry, so long as the judgment entry is supported by some competent, credible evidence." *Bunten* at 447, citing *Masitto v. Masitto,* 22 Ohio St.3d 63, 66, 488 N.E.2d 857 (1986).

{¶ 33}    In the case before us, the trial court indicated that it had considered the statutory factors in R.C. 3109.04, but it did not specifically discuss each factor.   The court did observe that it found Kyle's testimony credible with respect to Virginia's attempts to undermine Kyle's ability to exercise parenting time with K.H.   Thus, while Virginia had been the primary caretaker after she moved to Virginia with the child, Kyle's failure to be a current primary caretaker was a result of Virginia's interference with his parenting rights.

{¶ 34}    Virginia did testify at the hearing that K.H. loved being with her siblings.   This would not be unusual in a child of that age (four).   However, more important is the fact that the court expressed concern about the instability in Virginia's life, i.e., that she had lived in numerous residences since she moved to Virginia, and had changed jobs several times.   In addition, the court was concerned about the fact that Virginia left her three children in daycare overnight due to her work schedule, and had acknowledged that often when she worked, she was so tired that she slept at the daycare facility when she was finished working.   The children, therefore, were being left in daycare for extended periods of time beyond Virginia's work hours.

{¶ 35}    The trial court did say that it attached great significance to the recommendation of the family investigator that Kyle should be the residential parent.   However, the court also made its own findings, as noted above.   The trial court further found that Kyle had a more stable environment in which to raise the child, that Virginia had attempted to undermine Kyle's parenting time, and that Kyle was much more likely to facilitate a positive relationship with the non-custodial parent.   These observations are supported by competent, credible evidence in the record.   *Feldmiller* at ¶ 32.

{¶ 36}    Accordingly, we find no basis upon which to conclude that the trial court's decision was arbitrary, unreasonable, or unconscionable.   The Second Assignment of Error,

therefore, is overruled.

#### IV.   Should the Trial Court Have Interviewed the Minor Child?

**{¶ 37}**   Virginia's Third Assignment of Error states that:

The Court Abused Its Discretion by Not Interviewing the Minor Child.

**{¶ 38}**   Under this assignment of error, Virginia contends that the trial court abused its discretion by failing to interview the minor child.   In this regard, R.C. 3109.04(B)(1) provides that:

When making the allocation of the parental rights and responsibilities for the care of the children under this section in an original proceeding or in any proceeding for modification of a prior order of the court making the allocation, the court shall take into account that which would be in the best interest of the children.   In determining the child's best interest for purposes of making its allocation of the parental rights and responsibilities for the care of the child and for purposes of resolving any issues related to the making of that allocation, the court, in its discretion, may and, upon the request of either party, shall interview in chambers any or all of the involved children regarding their wishes and concerns with respect to the allocation.

**{¶ 39}**   We have held that where a party requests an interview of a child, the trial court must comply.   However, where an interview is not requested, the court has discretion over the decision.   *Mangan v. Mangan*, 2d Dist. Greene No. 07-CA-100, 2008-Ohio-3622, ¶ 21.   Again, we review the court's discretionary acts for abuse of discretion.   *Edwards*, 2d Dist. Montgomery No. 25309, 2013-Ohio-117, at ¶ 32.

**{¶ 40}**    Because neither party asked the trial court to interview K.H., the issue is whether the trial court acted arbitrarily, unreasonably, or unconscionably in failing to do so. *Edwards* at ¶ 33.   After considering the record, we cannot find that the court abused its discretion.   The child was less than five years old at the time of the hearing.   The  family investigator also declined to interview K.H. because of her young age, although she did observe K.H. interacting with each parent.

**{¶ 41}**    Virginia contends that the child could have provided the trial court with information about her siblings and community.   However, Virginia could, and did, inform the trial court as to these matters.

**{¶ 42}**    Based on the preceding discussion, the Third Assignment of Error is without merit and is overruled.

V.   Consideration of Virginia's Status as Primary Caretaker

**{¶ 43}**    Virginia's Fourth Assignment of Error is as follows:

The Court Abused Its Discretion by Giving No Consideration to the Fact
that Virginia Was the Primary Caretaker.

**{¶ 44}**    Under this assignment of error, Virginia contends that the trial court abused its discretion by failing to consider that she was the primary caretaker.   We have previously indicated that:

To be sure, "[t]he primary caregiver of a child is an important factor to be
considered in the initial allocation of parental rights." *Chelman v. Chelman*, 2d.
Dist. Greene App. No.2007 CA 79, 2008-Ohio-4634, ¶ 43, citing [*In re*] *Maxwell*
[, 8 Ohio App.3d 302, 456 N.E.2d 1218 (2d Dist. 1982)].   "However, a party's

role as the primary caregiver is not given presumptive weight over other relevant factors." [*Chelman*] at ¶ 43, 456 N.E.2d 1218. Where, as in the present case, both parents have served as primary caregiver at different times, a trial court has discretion to designate the father as legal custodian and residential parent if other evidence preponderates in his favor regarding the best interest of the children. *Williams-Booker v. Booker*, 2d Dist. Montgomery App. Nos. 21752, 21767, 2007-Ohio-4717, ¶ 13-16.

*Davis v. Davis*, 2d Dist. Clark No. 2011-CA-71, 2012-Ohio-418, ¶ 8.

{¶ 45} In the case before us, Kyle quit his job in 2011 and was a primary care-giver for K.H. and his step-son until Virginia removed K.H. from the state. When Kyle traveled to Virginia to be with his family, Virginia kicked him out after a week, and according to Kyle, prevented him from taking K.H. with him.[5] According to Kyle's testimony, which the trial court credited, Virginia thereafter interfered with Kyle's parenting time by concealing her addresses from him, by not answering his phone calls and texts, and by failing to produce the child when she was scheduled to do so. In May 2013, the trial court granted Kyle equal parenting time, and he would have been a primary caretaker between that time and the trial, but for Virginia's interference with his parenting time.

{¶ 46} The trial court concluded that it was in the best interests of K.H. for Kyle to be designated residential parent, and the record contains competent, credible evidence to support the court's conclusion. "When a custodial parent so obstructs the visits between the child and the noncustodial parent, then the best interest of the child is no longer being served." *In re S.M.T.*,

---

[5] Virginia did not either dispute or discuss this in her testimony.

8th Dist. Cuyahoga No. 97181, 2012-Ohio-1745, ¶ 7. Furthermore, other factors that the trial court considered, including the relative stability of the parties' situations, weighed in favor of Kyle's designation as residential parent. The trial court was entitled to place weight on these factors.

{¶ 47} Accordingly, the Fourth Assignment of Error is overruled.

VI. Issues Pertaining to the Investigator's Report

{¶ 48} Virginia's Fifth Assignment of Error states that:

The Trial Court Erred in Granting the Father Sole Custody Which Was Based Upon an Investigator's Report That Was Biased, Out-of-date, and Meant to Punish the Mother for Her Perceived Bad Behavior.

{¶ 49} Under this assignment of error, Virginia contends that the trial court improperly relied on the investigator's report, which was outdated and was biased against her. We disagree. The trial court mentioned the Investigator's Report, but the court also heard testimony from the parties, and made credibility decisions based on its observations of the parties.

{¶ 50} As an initial matter, Virginia cites authority indicating that a trial court does not have authority to change custody based on failure to implement parenting time. See *Culberson v. Culberson*, 60 Ohio App.2d 304, 397 N.E.2d 1226 (1st Dist.1978). We have also cited *Culberson* for the proposition that "R.C. 3109.04 does not permit a modification of custody based upon a finding of contempt." *Sheppeard v. Brown*, 2d Dist. Clark No. 2007 CA 43, 2008-Ohio-203, ¶ 54. However, both of these cases involve modification of prior permanent custody orders, not an initial custody order like the one involved in the case before us. *See Culberson* at 305; *Sheppeard* at ¶ 1. The fact that a party has been given temporary custody

during a divorce proceeding does not mean that he or she is necessarily entitled to custody after the final hearing. "The opposing parties in R. C. 3109.04 custody disputes are usually the child's parents, who may have nearly equal emotional, financial and educational advantages to offer the child and who are on an equal footing before the law." (Footnote omitted.) *In re Perales*, 52 Ohio St.2d 89, 96, 369 N.E.2d 1047 (1977), citing R.C. 3109.03.

{¶ 51} Nonetheless, both the initial permanent custody orders and modification of those orders are governed by R.C. 3109.04 and the factors contained in R.C. 3109.04(F) – which we have already concluded were properly applied in this case.

{¶ 52} Contrary to Virginia's contention, the trial court did not base its decision solely on the fact that visitation had been denied. Instead, as was noted above, the court found that Kyle's situation offered K.H. more stability.

{¶ 53} Virginia also argues that the family investigator's report and recommendations were calculated to punish Virginia for what the investigator perceived as poor behavior. As an example, Virginia points to the investigator's interpretation of Virginia's actions in rescheduling an appointment in late December 2012. The investigator noted that Virginia had called to cancel the appointment due to blizzard warnings, when weather reports showed only a light dusting in the area where Virginia lived. Virginia contends that weather is changeable and that one cannot telephone days in advance to cancel appointments due to the weather. Virginia also contends that the investigator should have checked the weather for the entire 500-mile distance between the Washington D.C. area and Dayton if the weather report were deemed that important.

{¶ 54} Virginia's arguments miss the point. The significant issue was that Virginia called one hour before her scheduled appointment to cancel, claiming that the weather prevented her from attending. In view of the fact that the distance between Dayton and the Washington

D.C. area is 500 miles, there is no way that Virginia could have made the appointment regardless of the weather. She was also scheduled to deliver K.H. to her father for visitation at the same time. The late notice and the excuse given made it clear that Virginia had no intention of complying with either the visitation schedule or her scheduled appointment. These matters bear on her credibility and on her willingness to facilitate K.H.'s relationship with Kyle. Notably, Virginia does not deny that the incident happened, and the fact that the investigator mentioned it does not demonstrate punitive intent.

{¶ 55} According to Virginia, the investigator (and later the court, relying on the investigator), improperly concluded that her life was unstable, due to several changes in her job and residence. We have already discussed these matters, and the record supports the trial court's conclusions about instability in Virginia's life. This conclusion was, in fact, based on Virginia's testimony at the hearing, which showed even less stability than when Virginia was interviewed by the family investigator in January 2013.

{¶ 56} Specifically, when Virginia talked to the family investigator, she lived in a three-bedroom house in Manassas Park, Virginia, and had been working at Burke Health and Rehab Center since November 2012, on a schedule where she worked either 7:00 a.m. to 3:00 p.m. or from 3:00 p.m. until midnight. At the time, her daycare provider was a private family that she had known since high school. She also denied having any significant other since she had lived in Virginia. *See* Court Ex. I, pp. 1-2.

{¶ 57} By the time of the final divorce hearing, one year later, Virginia had delivered another child, who was born on December 1, 2013. She also had a different employer and a different address – a two-bedroom apartment, which would be less appropriate for three children than her prior three-bedroom residence. Virginia was also working a different schedule, from

7:00 p.m. until 7:00 a.m., which required her to leave her children with her daycare provider (a church) overnight. As was previously noted, Virginia testified that she often slept at the daycare after she got off work, meaning that the children were there for an extended period of time beyond the time she was working. In contrast, Kyle was living in a two-bedroom home by himself, and there was no indication that his living situation or employment was unstable.

{¶ 58} We also note that Virginia did not ask for an updated report from the investigator. However, even if she had, her circumstances had become more unstable, not less, since the last report.

{¶ 59} Based on the preceding discussion, the Fifth Assignment of Error is overruled.


VII. Conclusion

{¶ 60} All of Virginia's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, P.J. and DONOVAN, J., concur.


Copies mailed to:

David M. McNamee
Elizabeth J. Henley
Hon. Timothy D. Wood